[630 NYS2d 290]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ANTHONY McCLENTON, Appellant.

First Department, July 27, 1995

### APPEARANCES OF COUNSEL

*Jennifer L. Colyer* of counsel, New York City *(Mark Gimpel* on the brief; *E. Joshua Rosenkranz* and *Ira Mickenberg, Office of Appellate Defender,* and *Fried, Frank, Harris, Shriver & Jacobson,* attorneys), for appellant.

*Arthur D. Middlemiss* of counsel, New York City *(Mark Dwyer* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

### OPINION OF THE COURT

MAZZARELLI, J.

The trial court erred when it denied the defendant's timely request to make a "probing and tactful inquiry" of a juror who, before deliberations even commenced, wrote a note which indicated that the juror's discharge might be required under CPL 270.35. Because nisi prius failed to conduct any inquiry whatsoever, the court's implied finding that the allegedly wayward juror was not "grossly unqualified" and had not "engaged in misconduct of a substantial nature" necessarily rests upon impermissible speculation. Therefore, the judgment of conviction must be reversed and the matter remanded for a new trial.

At the conclusion of its final instructions to the jury, the trial court stated to the jurors: "This completes my final instructions. However, at this point, I have to discuss my charge with the lawyers. So I'm going to ask you to please step into the jury room for a few moments. *Please do not begin*

*your deliberations, you'll be coming right back.* So you may retire to the jury room." (Emphasis added.) The court reporter noted, "Juror[s] leave courtroom at 1:53 p.m." The court then held a brief discussion with counsel in which it solicited objections to the charge and additional requests for instructions. The court granted the prosecutor's request to charge acting in concert, and, as noted in the transcript, "[a]t 2:00 o'clock the jurors entered the courtroom" for the conclusion of the final instructions. The court ended by thanking and discharging the alternate jurors ("at 2:06 p.m.") and by instructing the others, "You may *now* retire to the jury room to *begin your deliberations."* (Emphasis added.) The court reporter then noted, "Jurors commence deliberations at 2:07 p.m."

The following colloquy regarding a note from a juror then ensued.

"[DEFENSE COUNSEL]: I noticed one of the jurors passed a note in earlier and the court officer took it but I didn't know what it was, it was Mr. [R] * * *.

"THE COURT: Passed a note?

"[DEFENSE COUNSEL]: To the court officer. He put it on the corner of the witness stand. * * *

"THE COURT: We'll find out what that is. * * * did someone give you a note, [did] one of the jurors give you a note?

"[COURT OFFICER]: It was for his job.

"THE COURT: You can show it to counsel. [Note shown to counsel] * * *

"THE COURT: All right?

"[DEFENSE COUNSEL]: No, I think we need to have hearing on it.

"THE COURT: Let me see the note. [Note shown to court]

"THE COURT: All right, for the record, the note gives a telephone number to [call] and says Broadway Video, M * * * R * * *. *Scheduling problem. 'It's beyond a reasonable doubt that M * * * R * * * will make it to work tonight.* Thanks.' Same number again.

"What would you like with this?

"[DEFENSE COUNSEL]: Well, that note was given *before the charges were complete* to the court officer and I think it evinces a *predetermination by that juror prior to having heard all the charges* that he would—he was determined that *this case would be over as far as he was concerned in time for him to go to work this evening.* And that of course is an *inappropri-*

*ate position for a juror* to take and I think that *he needs to be questioned with regard to that.*

"THE COURT: You want to be heard, Miss [Prosecutor].

"[PROSECUTOR]: Very briefly, your Honor. I think that juror sees that it's ten after two, when he says make it to work tonight, *it's possible* he goes to work at midnight, *who knows* and *I think* it was just sort of his clever *humorous way* in the context of the participation *to express his belief that given however many number of hours it is until he goes to work tonight that he will be available.* Of course if he's not, if the jury has not reached a verdict at that time, he won't be available. So that's—

"THE COURT: Request by defense to interview this individual in furtherance of this note is denied. I note that this note does not make any indication that he's—what his verdict would be, whether it be guilty or not guilty, as to any of the counts. And as far at the Court is concerned, [it] doesn't make any sense what he's written." (Emphasis added.)

At 5:15 P.M., after having sent notes requesting clarification of the law and the rereading of testimony, the jury returned a guilty verdict.

CPL 270.35 provides, in relevant part, that, "[i]f at *any time* after the trial jury has been sworn and *before the rendition of its verdict* * * * the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature * * * the court *must* discharge such juror." (Emphasis added.) In determining whether a juror's discharge is required under the statute, each case must be evaluated on its unique facts *(People v Buford,* 69 NY2d 290, 299). The Judge should conduct a "probing and tactful" inquiry, and the reasons for the court's ruling should be placed on the record *(supra,* at 299). "In reaching its conclusion, the trial court *must* question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant" *(supra,* at 299 [emphasis added]; *see also, People v Rodriguez,* 71 NY2d 214, 219). In a footnote in *Buford,* the Court of Appeals stated that an in camera hearing "may not be necessary in the *unusual* case involving an obviously trivial matter where the court, *the attorneys, and defendant all agree* that there is *no possibility that the juror's impartiality could be affected* and that there is no reason to question the juror" *(supra,* at 299, n 4). Finally, in determining whether a juror is

grossly unqualified, "the court may not speculate as to possible partiality of the juror" *(supra,* at 299).

Unlike the situation outlined in footnote 4 of *Buford,* here the defense expressly disagreed with the court's assessment that there was no possibility that the allegedly wayward juror's impartiality could be affected. It may be that, as the prosecution asserts, the juror was merely being jocular in using the phrase "beyond a reasonable doubt" and had not already decided defendant's guilt. However, without findings after an inquiry, such a characterization is no more based on established facts than alchemy. Likewise, the prosecutor's suggestion that the juror's workday started at midnight, which if true, would have substantially lessened a conclusion that the juror had already made up his mind on the issue of guilt or nonguilt, should have been established by court inquiry, not the prosecutor's supposition.

The note in this case is dismissed in the dissent as merely reflecting the juror's "somewhat flippant attitude," rather than indicative of a potentially more serious problem requiring inquiry of the juror. In relying on its own " 'sense' " of what it concedes was an "ambiguous" note, the dissenter makes dramatic reference to the era of the Star Chamber. It is certainly just as true today, in the era of Elizabeth II, as it was in the time of Lord Bacon and Elizabeth I referred to by the dissent, that neither the trial court, nor this, nor any other court, can see into the hearts or minds of women and men. This, however, is precisely why, when faced with an ambiguous note, nisi prius should have acceded to defense counsel's request to make inquiry. Neither the dissenter's " 'sense' " of the import of the juror's note nor the trial court's determination that the note "doesn't make any sense" is an adequate substitute for an explanation of its meaning from the only person who could have "demystified" the situation, the note's author. Indeed, on this record, whether the juror here came to the deliberating table predisposed on the issue of defendant's guilt and/or with a self-imposed deadline for reaching a verdict is a question that can only be answered by resorting to speculation.

Although cases applying *Buford (supra)* most frequently arise in the context of a trial court's removal of a juror over defendant's objection, there is no persuasive reason that the same standard should not apply when the court refuses to conduct an inquiry of a juror that defendant believes to be "grossly unqualified" or to be guilty of "substantial miscon-

duct" *(see, People v South,* 177 AD2d 607). In urging an affirmance of defendant's conviction, the dissenter impliedly declares his confidence that the "somewhat flippant" juror fully carried out his solemn oath and obligation as a juror. We are not so sanguine.

It may be that removal of the juror in this case would have proved unnecessary had such a fact-specific finding been made after the inquiry envisioned by *Buford (supra).* The trial court's refusal to conduct an inquiry, however, means that it will never be known whether this defendant was tried by a jury which did not engage in premature deliberations, did not commence deliberations with a predisposition toward a finding of guilt, or did not operate under a time constraint for reaching its verdict. Although the dissenter's " 'sense' " of the note is that the juror saw this as a simple case susceptible of a quick verdict, there are other equally strong inferences. For example, it may be that the juror was willing to vote whichever way set him free from the jury room without regard to his true individual assessment of the evidence. Surely, had the defendant gained an acquittal under such circumstances, the People would not have been afforded a fair trial and the cause of justice would not have been served. So too, then, is justice not served by a conviction obtained under questionable circumstances which could have been easily clarified had appropriate inquiry been timely made.

Finally, the dissent's characterization of the trial court's refusal to make any inquiry whatsoever as "a sound conclusion as to the proper limits of its power" is troubling not only for what it condones in this particular matter, but in its failure to encourage trial courts to follow the procedures set forth by the Court of Appeals in *Buford (supra).* Notwithstanding his protest that there is nothing "pernicious about [conducting] a hearing per se", the approach urged upon us by the dissenter is implicitly premised on a belief that a trial jury which has proceeded to the point of receiving instruction on the law, is somehow more "insulated from any * * * judicial scalpel" than, in descending order, a juror who has not heard the court's charge, counsel's summations or the witnesses' testimony. However, if CPL 270.35's express provision for the discharge of a juror up until "the rendition of [a] verdict" is to have any meaning, the dissent cannot be correct that the juror's misconduct must somehow be more blatant or more egregious as the trial progresses toward a verdict before an inquiry is mandated. Consideration of whether the juror was

*"entitled* to have * * * thoughts" about defendant's guilt or nonguilt at the stage he wrote the note does not resolve the question raised by the note and which defense counsel sought to have the trial court answer. The note suggested the possibility that the juror, who had not been told to commence deliberations at the time he wrote the note, was either unwilling to examine the validity of "those thoughts" with the other jurors, had already done so, or would compromise them for the expedience of reaching a verdict in time to go to work. It is important to keep in mind that at issue here is not whether the juror ultimately would or should have been discharged, but rather, simply whether the trial court should have made inquiry. The failure of the trial court to make the requested inquiry was error which affected defendant's "constitutional right to a jury trial and [he] is therefore entitled to a new trial" *(People v South, supra,* at 608).

Accordingly, the judgment of the Supreme Court, New York County (Charles J. Tejada, J.), rendered October 29, 1992, which convicted defendant, after jury trial, of robbery in the first and second degrees and sentenced him, as a persistent violent felony offender, to concurrent terms of 10 and 8 years to life imprisonment, respectively, should be reversed, on the law and the facts, and the matter remanded for a new trial.

WALLACH, J. P. (dissenting). On this appeal, we are required to consider whether a note written by a juror and delivered to a court officer for transmittal to the juror's employer was conduct (or possible misconduct) requiring inquiry or other intervention by the Trial Judge. On this record, I am led to conclude that the court committed no error in declining to pursue the matter after the jury had retired.

At 2:00 P.M. on the final day of trial, at the prosecutor's request, the Judge delivered to the jury a supplemental charge on acting in concert, emphasizing that a finding of criminality on that basis would have to be made "beyond a reasonable doubt". During the course of this six-minute supplemental instruction, one juror was observed passing a note to a court officer, which the officer later told the court "was for his [i.e., the juror's] job." After the alternates were dismissed and the regular jurors were excused to commence deliberations, the note was read in court, at defense counsel's request. It contained the juror's name, his apparent place of employment (Broadway Video) and a telephone number, and referred to a "[s]cheduling problem": "It's beyond a *reasonable*

doubt that M[—] R[—] will make it to work tonight. Thanks." The trial court denied defense counsel's request that this juror be questioned, stating that the note, which "doesn't make any sense", indicated no predisposition toward a verdict in either direction. Be that as it may, the jury returned at 5:15 P.M. with a verdict of guilty on both counts of the indictment.

Any juror who, in the course of a trial, is found to be "grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature" must be discharged (CPL 270.35). In my view, nothing in this note, addressed entirely to an outsider, rose to the level of "misconduct" of any kind, much less misconduct of a *substantial* nature, to trigger the need for the "probing and tactful inquiry" called for in *People v Buford* (69 NY2d 290, 299).

The note was written not only after all the evidence was in and both sides had rested and summed up, but also after the main charge (27 pages in the record) was fully delivered, and a five-page supplemental charge (at the prosecutor's request) was either in progress or completed. Nothing in the note suggested that any premature deliberation with any other juror had occurred. The "sense" of the note, as I read it, is that the case appeared simple to this juror and susceptible to a speedy verdict. It is ambiguous insofar as what that verdict would be. The note may hint at a state of mind inclined toward the prosecution, but I would suggest that the mental processes of an individual juror's mind on the brink of deliberation, standing alone, are not a subject fit for judicial inquiry. To test this, one need only ask whether the trial court should undertake to inquire of this or any other juror whether, and then why, he or she seemed to be favoring the defendant. Clearly, that would be error *(see, People v Garcia,* 153 AD2d 951, 953, *lv denied* 75 NY2d 919). This particular juror was insulated from any such judicial scalpel, however "tactfully" applied, for the same reason Lord Bacon admired the statecraft of the young Elizabeth I: "Her Majesty not liking to make windows into men's hearts and secret thoughts, except the abundance of them did overflow into overt and express acts or affirmations, tempered her law so as it restraineth only manifest disobedience".[1] While that idea was undoubtedly a novelty in Tudor England, especially to some members of Her Majesty's Star Chamber, it has won wide acceptance in the

---

1. Johnson, Elizabeth I: A Biography, at 88 (Holt Rinehart and Winston, New York, 1974), citing Spedding, Life and Letters of Bacon (I:97-98).

common law today. We are now content to accept manifest behavior as a reliable indicator of mental state, with the proviso that any such inference is permissive and not mandatory *(People v Getch,* 50 NY2d 456; *People v Green,* 50 NY2d 891, *cert denied* 449 US 957).

Since there was no manifest disobedience of any direction of the court or, for that matter, any other legal standard, the omission of the court to conduct an inquiry did not result in reversible error. The prerequisite for such disqualification is a finding that the juror *prematurely* (i.e., during the course of the trial testimony or before the charge on the applicable law) possesses a state of mind which would prevent the rendering of an impartial verdict *(see, People v Buford, supra).*

My fundamental difficulty with the majority position is not that there is anything pernicious about a hearing per se, but that when it comes to delineating the possible scope of the inquiry, each topic suggested would inevitably lead to nothing more than the inner thoughts of the juror. My point is simply that he was *entitled* to have those thoughts at that stage of the trial when he wrote the note, and then to express them to his fellow jurors the minute he crossed the threshold of the jury room and deliberations commenced.

In *People v Estrada* (191 AD2d 286, *lv denied* 81 NY2d 1013), we held that the conduct of a juror in greeting a prosecution witness and advising the prosecutor that the trial exhibits were incorrectly numbered was "innocuous and did not require a hearing to determine whether the juror was involved in 'misconduct of a substantial nature' within the meaning of CPL 270.35". I believe the juror's conduct here was even more innocuous, because it was not disclosed to anyone but himself and the court officer chosen by the juror as his messenger. Even a remark that the trial " 'won't take long' " does not necessarily demonstrate that the defendant is being deprived of a fair and impartial assessment of the evidence *(People v Hauver,* 129 AD2d 889, 891).

I do not mean to suggest that the trial court's power and duty to inquire with respect to alleged juror misconduct was curtailed in any way simply because the trial had reached the moment for jury deliberations to commence. That power to confront misconduct when it occurs in the course of deliberations clearly exists *(People v Rodriguez,* 71 NY2d 214; *cf., People v Almodovar,* 196 AD2d 718, *lv denied* 82 NY2d 890, *cert denied* — US —, 114 S Ct 2143). Indeed, the court's

contempt power, traditionally limited to acts committed "in the presence of the court", has been held to reach misconduct involving a juror which was committed even beyond the eyes and ears of the Judge.[2]

To conclude, despite this juror's somewhat flippant attitude and the trial court's mystification as to the import of the note, the latter's decision not to conduct the inquiry as requested was not only a proper exercise of discretion *(see, People v Aksoy,* 191 AD2d 271, 273, *affd* 84 NY2d 912), but also a sound conclusion as to the proper limits of its power.

I respectfully dissent, and would affirm the judgment of conviction.

ASCH, NARDELLI and TOM, JJ., concur with MAZZARELLI, J.; WALLACH, J. P., dissents in a separate opinion.

Judgment, Supreme Court, New York County, rendered October 29, 1992, reversed, on the law and the facts, and the matter remanded for a new trial.

---

2. In a classic decision shortly before his elevation to the Court of Appeals, Justice Albert Conway held that illicit intimacy between a female juror and the officer in charge of the jury was regarded as having constructively occurred in the presence of the court *(People v Higgins,* 173 Misc 96).